IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KENNETH A. CARSON, | ) |
| | ) |
| Plaintiff | ) Case No. 1:17-cv-00073 (Erie) |
| | ) |
| vs. | ) United States Magistrate Judge |
| | ) Richard A. Lanzillo |
| JEFFREY WETZEL, et al., | ) |
| | ) MEMORANDUM OPINION ON |
| Defendants | ) DEFENDANTS' MOTIONS FOR |
| | ) SUMMARY JUDGMENT |
| | ) |
| | ) ECF Nos. 88 and 98 |

I. Introduction

Plaintiff Kenneth A. Carson commenced this §1983 action based on allegations that Pennsylvania Department of Corrections (DOC) officials and medical personnel at the State Correctional Institution at Forest, Pennsylvania (SCI-Forest) violated his rights under the Eighth Amendment to the U.S. Constitution by displaying deliberate indifference to his serious medical needs. The remaining defendants in this action fall into two categories: the "Medical Defendants" (Barry Eisenberg, D.O., and Lisa Zupsic, C.R.N.P.), and the "DOC Defendants" (Secretary of the DOC John Wetzel, Superintendent at SCI-Forest Michael Overmeyer, and Corrections Health Care Administrator Kimberly Smith). Each group has filed a motion for summary judgment. For the reasons discussed below, the Court will grant both motions.[1]

II. Relevant Procedural History

Carson filed this lawsuit alleging that the Defendants violated several of his rights during a series of incidents at SCI-Forest, beginning on January 5, 2016. *See* ECF No. 55. Carson's

---
[1] All parties have consented to the jurisdiction of a United States Magistrate Judge over the matter. ECF Nos. 26, 32, 36, 37. *See also* 28 U.S.C. § 636(c)(1).

1

Complaint named nineteen individuals as defendants, all of whom were employees of the DOC or medical providers at SCI-Forest. By Order dated February 5, 2019, the Court dismissed all claims against Defendants Dasily, Dicky, Z. Gearhart, John Does 1, 2, 3, 4, Miller, Keri Moore, L. Reeher, E.J. Sager, Stonebraker, and Dorina Varner for failure to prosecute. ECF No. 78. This Order left only one claim pending in this action, Carson's Eighth Amendment claim against Defendants Eisenberg, Zupsic, Wetzel, Overmeyer, and Smith.

After discovery, the DOC Defendants and Medical Defendants filed separate motions for summary judgment. At the request of the Court, Attorney Alexander K. Cox agreed to represent Carson for purposes of opposing the motions for summary judgment.[2] The matter has been fully briefed and is ripe for disposition.

III. Factual Background

At all relevant times, Carson was incarcerated at SCI-Forest. On January 5, 2016, around 1:29 p.m., Carson experienced a "black out episode" while at triage and was subdued by correctional officers. ECF No. 113-1, ¶ 3; ECF No 89-1, p. 183. During this incident, Carson injured his right (dominant) hand. ECF No. 113-1, ¶ 3. At triage, Carson complained to staff members nearby that his hand was in pain and possibly broken. ECF No. 113-1, ¶ 3. Dr. Eisenberg entered a note at 4:00 p.m. on January 5, 2016, indicating that he had examined Carson and recording, among other things, that Carson had "abrasions of his right fist [], of unknown etiology." ECF No. 89-1, p. 134, 185. Dr. Eisenberg asserts that he ordered medical staff to take Carson's vitals four times daily.[3] *Id.* Carson disputes this assertion. At 5:30 p.m.

---

[2] The Court expresses it gratitude to Attorney Cox for his willingness to volunteer his time and professional talent to assist Mr. Carson.

[3] Carson contends that the notation upon which Dr. Eisenberg bases this assertion is illegible and the resulting ambiguity must be construed in his favor. The Court, upon careful review of the note, cannot decipher its content.

2

on January 5, 2016, RN Holser entered a note indicating that Carson informed her that his hand hurt. *Id.* at 182.

Dr. Eisenberg examined Carson again the next morning (January 6, 2016) around 10:00 a.m. ECF No. 113-1, ¶ 6; ECF 89-1, p. 134. At the time of this examination, Carson's hand had swollen to the size of a "boxing glove." ECF No. 113-1, ¶ 6. Carson informed Dr. Eisenberg that he had pain in that hand, that it might be broken, that he could not make a fist, and that he needed an x-ray. *Id.* Dr. Eisenberg wrapped Carson's hand in gauze. *Id.* RN Hoffman noted that Carson would receive medication, and, on January 6, 2016, Carson received one dose of ibuprofen. ECF 89-1, p. 182; ECF No. 113-1, ¶ 9.

Carson made a sick call request for the pain in his hand on January 8, 2016. ECF No. 113-1, ¶ 8. Four days later, on January 12, 2016, he was seen by Nurse Zupsic at the RHU cell door in response to his sick call. ECF No. 113-1, ¶ 12; ECF 89-1, pp. 134, 182. Nurse Zupsic noted the following regarding Carson's hand: (1) circulation, sensation, and motion were intact; (2) strength was 4/5; (3) Carson was able to flex and extend his hand; (4) there was tenderness over the metacarpal of fourth and fifth lateral aspect; and (5) scabs were forming over his knuckles. ECF No. 89-1, pp. 134, 182. Following her examination at the RHU cell door, Nurse Zupsic ordered an x-ray of Carson's right hand and provided him with ibuprofen. *Id.*; ECF No. 113-1, ¶ 13. Carson disputes the accuracy of Nurse Zupsic's diagnostic notes. Specifically, he contends Nurse Zupsic did not perform a hand squeeze test or any other physical test at the cell door evaluation. ECF No. 113-1, ¶ 11-12. He further contends that he was not in fact able to flex and extend his hand, and that his hand strength was "far from a 4/5." *Id.*

The following day, on January 13, 2016, Carson underwent an x-ray of his right hand. ECF No. 113-1, ¶ 13. On January 15, 2016, Nurse Zupsic entered an order that Carson was to

consult "with ortho." ECF No. 89-1, pp. 130, 180. On January 15, 2016, Carson made a sick call regarding pain in his hand and to receive his x-ray results. ECF No. 113-1, ¶ 16. He was seen in response to his January 15 sick call four days later, on January 19, 2016, by Nurse McKeel. ECF No. 113-1, ¶ 17. Nurse McKeel was not aware of the x-ray but saw the note "ortho consult" and provided Carson with ibuprofen. She also wrapped and splinted Carson's hand with an ace bandage "due to recent fracture." ECF No. 89-1, pp. 130, 1320133, 180-181. Carson requested a higher dose of medication, but this request was denied by Nurse McKeel. ECF No. 113-1, ¶ 19.

During the January 19, 2016 sick call, Carson saw Dr. Eisenberg in the hallway and spoke with him. ECF No. 113-1, ¶ 17-20. Carson informed Dr. Eisenberg that his hand still hurt. *Id.* Dr. Eisenberg responded that he thought Carson had arthritis. *Id.* Dr. Eisenberg did not mention the January 13 x-ray results. *Id.*

On January 25, 2016, Carson was transported to Kane Community Hospital for a consultation with Dr. Vasileios Kostopoulos, an orthopedic surgeon, for a right-hand fracture. ECF No. 89-1, pp. 88, 94, 179. From his review of the January 13 x-ray, Dr. Kostopoulos noted the following: (1) fourth metacarpal fracture without significant displacement; and (2) 80 degrees of angulation of the neck and head fractures of the fourth metacarpal. *Id.* Following a physical examination of Carson's right hand, Dr. Kostopoulos noted the following: (1) wound over the third metacarpal head in the healing process; (2) some deformity in the ring and little finger with shortened metacarpals; (3) range of motion was mildly diminished and Carson was nearly able to make a full fist; (4) no evidence of overlapping or malrotation during the range of motion; and (5) extensor tendons were intact. *Id.* Based upon his examination, Dr. Kostopoulus determined Carson to be a candidate for open reduction and osteosynthesis with a K-wire. *Id.* That same

day, Dr. Eisenberg requested the recommended surgery as well as a preoperative EKG and chest x-ray. ECF No. 89-1, p. 186-187.

On January 28, 2016, Carson underwent surgery upon his right hand to address fourth and fifth metacarpal fractures. ECF No. 89-1, p. 86-97, 93, 179, 188-190. The operation included open reduction and osteosynthesis with K wires and surgical pins for both fractures. *Id.* Following the surgery, Carson was discharged with a prescription for Percocet and Bactrim DS. *Id.* He was scheduled to attend a follow-up appointment in three weeks for the removal of the K wires. *Id.*

Following the surgery, Carson regularly participated in physical therapy and followed all medical directives. ECF No. 113-1, ¶ 25. Since January 28, 2016, he continues to suffer from daily pain, sometimes reaching levels of 7 or 8 out of 10. ECF No. 113-1, ¶ 26. He is still unable to make a fist with his right hand and has reduced strength in his pinky and ring fingers. ECF No. 113-1, ¶ 27. He experiences tingling and numbness in his fingers and right hand, and his right hand is deformed; specifically, his fingers now permanently overlap. ECF No. 113-1, ¶ 28-29. As noted, he is right-hand dominant. ECF No. 113-1, ¶ 31.

On August 12, 2016, Carson filed a grievance to Corrections Health Care Administrator Kimberly Smith which outlined the alleged mistreatment and lack of medical attention that Carson believes he received in January. ECF No. 113-1, ¶ 33, 34. Defendant Smith denied the grievance. *Id.* Defendants Overmeyer and Wetzel then denied Carson's appeals of Smith's denial. ECF No. 113-1, ¶ 37.

5

IV.     Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) requires a court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.* at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court must view the facts and draw all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To defeat a properly supported motion for summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56 to go beyond his pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

V.   Analysis and Discussion

A prisoner's Eighth Amendment claim of cruel and unusual punishment based upon inadequate medical care will survive summary judgment where the factual record supports two elements: (1) the plaintiff's serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. *See Estelle v. Gamble*, 429 U.S. 97 (1976) (stating that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment") (internal quotation omitted); *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Carson asserts that the record in this case presents genuine factual disputes as to each of these elements. The Defendants argue that the record cannot support a finding of deliberate indifference against any of them.

A.   Serious medical need.

As a preliminary matter, the Court finds that Carson's hand fractures and related conditions constituted a serious medical need. A serious medical need is "one that has been diagnosed as requiring treatment or one that is so obvious that a lay person would easily

7

recognize the necessity for a doctor's attention" See *Walker v. Brooks*, 2009 WL 3183051 (W.D. Pa. Sept. 30, 2009) (citing *Monmouth County Correction Institute Inmates v. Lanzaro*, 834 F. 2d 326, 347 (3d Cir. 1987); *see also Senisais v. Fitzgerald*, 940 F. Supp. 196, 199 (N.D. Ill. 1996 (broken hand constitutes serious medical need). Accordingly, the only issue regarding each moving Defendant is whether he or she was deliberately indifferent to Carson's serious medical need.

B.  Deliberate Indifference

Deliberate indifference is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury, *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury." *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990). It is well-settled that "an inmate's dissatisfaction with a course of medical treatment, standing alone, does not give rise to a viable Eighth Amendment claim." *Tillery v. Noel*, 2018 WL 3521212, at *5 (M.D. Pa. June 28, 2018) (collecting cases). Such complaints fail as constitutional claims because "the exercise by a doctor of his professional judgment is never deliberate indifference." *Gindraw v. Dendler*, 967 F. Supp. 833, 836 (E.D. Pa. 1997) (citing *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.")). "Therefore, where a dispute in essence entails nothing more than a disagreement between an inmate and doctors over alternate treatment plans, the inmate's complaint will fail as a constitutional claim under § 1983." *Tillery*, 2018 WL 3521212, at *5 (citing *Gause v. Diguglielmo*, 339 Fed. Appx. 132 (3d Cir. 2009) (characterizing

8

a dispute over pain medication as the type of "disagreement over the exact contours of [plaintiff's] medical treatment" that does not violate the constitution)).

Similarly, "the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice standing alone is not a constitutional violation." *Tillery*, 2018 WL 3521212, at *5 (quoting *Estelle*, 429 U.S. at 106). "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer*, 991 F.2d at 67 (citations omitted). Thus, "courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care." *Hensley v. Collins*, 2018 WL 4233021, at *3 (W.D. Pa. Aug. 15, 2018) (quoting *Clark v. Doe*, 2000 WL 1522855, at *2 (E.D. Pa. Oct. 13, 2000)). *See also Wisniewski v. Frommer*, 751 Fed. Appx. 192, 195-96 (3d Cir. Oct. 3, 2018) (noting that "there is a critical distinction 'between cases where the complaint alleges a complete denial of medical care and those alleging inadequate medical treatment.'") (quoting *Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017)).

    C.    Deficiencies in Dr. Eisenberg's medical care did not rise to the level of deliberate indifference.

Eisenberg argues that the record is insufficient to sustain a finding that he acted with deliberate indifference to Carson's serious medical need. Based upon the record, the Court agrees.

It is undisputed that Dr. Eisenberg examined Carson on January 5, 2016 and recorded that he had "abrasions of his right fist [], of unknown etiology," ECF No. 89-1, p. 134, 185. The record also reflects that Dr. Eisenberg again examined Carson the following morning. ECF No. 113-1, ¶ 6; ECF 89-1, p. 134. Carson's claim against Dr. Eisenberg rests in part on the condition of his hand at the time of this examination and Dr. Eisenberg's treatment in reaction to that

9

condition. Carson asserts his hand had swollen to the size of a "boxing glove" and that he told Dr. Eisenberg that he had pain in that hand, that it might be broken, that he could not make a fist, and that he needed an x-ray. ECF No. 113-1, ¶ 6. Although Dr. Eisenberg disputes certain of these assertions, the Court accepts them as factually accurate for purposes of the pending motions for summary judgment. Rather than order an x-ray, Dr. Eisenberg wrapped Carson's hand in gauze, and Carson received one dose of ibuprofen on January 6, 2016. ECF 89-1, p. 182; ECF No. 113-1, ¶ 9. Carson's hand was not x-rayed until January 13, 2016, one week after he last saw Dr. Eisenberg, and this x-ray had been ordered by Nurse Zupsic, not Dr. Eisenberg. ECF No. 113-1, ¶ 13. Two days later, on January 15, 2016, Nurse Zupsic entered an order that Carson was to consult "with ortho." ECF No. 89-1, pp. 130, 180. The orthopedic consult at Kane Community Hospital occurred on January 25, 2016. In the meantime, Carson encountered Dr. Eisenberg in the corridor and inquired about his x-ray results. Dr. Eisenberg appeared to be unaware the Carson had undergone an x-ray and showed little or no recollection of his recent medical history. Not long after this encounter, Dr. Vasileios Kostopoulos determined that Carson had right-hand fractures that required surgery.

Based upon the foregoing evidence, a reasonable jury could find that Dr. Eisenberg was less than diligent in his attention to Carson's injury and that this lack of diligence resulted in a week-long delay in an x-ray of Carson's hand and, perhaps, a delay of some additional days in Carson's orthopedic consult and ultimate surgery. Whether Dr. Eisenberg's care fell below the general standard of care, however, is not the issue before the Court. As noted, medical malpractice standing alone is insufficient to constitute an Eighth Amendment violation. *Tillery*, 2018 WL 3521212, at *5. Instead, the record must support a finding that Dr. Eisenberg was deliberately indifferent to Carson's serious medical need, and the relatively minor delays in this

case do not reach that threshold. Carson received medical care from Dr. Eisenberg and other medical personnel between his injury on January 5, 2016 and his orthopedic consult on January 25, 2016. Although the care was relatively modest (e.g. cursory examinations, wrapping of his hand, and providing ibuprofen), it at least demonstrates that medical personnel did not ignore his injury, and while ordering an x-ray before January 13, 2016 likely would have accelerated treatment of the injury, the delay that occurred was far short of enough to constitute deliberate indifference.

The facts and the court's analysis in *DeJesus v. Corr. Med. Servs., Inc.*, 2013 WL 6804604, at *4 (D. Del. Dec. 23, 2013) illustrate the foregoing principles. In that case, the court granted the defendant-providers' motion for summary judgment, holding that a delay in removing the inmate-plaintiff's gallbladder was not an Eighth Amendment violation. *Id.* at *1. The plaintiff had suffered from on-going liver ailments that were initially attributed to a Hepatitis C infection. For approximately 21 months, he received medical treatment—including blood tests and ultrasounds, as well as enrollment in a Hepatitis C Intervention program, but he continued to experience side pains. An August 2, 2007 ultrasound of his abdomen indicated that his liver was deteriorating. *Id.* Five days later, the plaintiff experienced increased pain and requested to see a doctor. *Id.* Three days later, a nurse advised the plaintiff that he could not see a doctor because his blood work was not yet complete. Although the plaintiff's blood work was supposed to be completed within three days after he saw the nurse, he was never called to have the blood work performed. He continued to go to the infirmary daily complaining of pain for another month. *Id.* Ultimately, other inmates notified prison guards that the plaintiff was crying out in the middle of the night in "excruciating pain," and he was taken to the infirmary to see a nurse. *Id.* On

11

September 17, 2007, he was transported to a hospital emergency room where he was diagnosed with acute cholecystitis; emergency surgery was then performed to remove his gallbladder. *Id.*

The court held that the delay of medical treatment between August 2, 2007, and the emergency surgery of September 17, 2007, was insufficient to establish a claim of deliberate indifference against any of the defendant-providers. *Id.* at *4. The court relied upon the fact that no defendant knew of the plaintiff's specific need for surgery. *Id.* The court further held that the defendants' collective conduct following the August 2 ultrasound and leading up until the September 17 emergency surgery constituted, at most, a claim for negligence in diagnosis the plaintiff's gallbladder condition. *Id.*

In this case, approximately three weeks passed before Carson received corrective surgery. This three-week delay in treatment is far shorter than the delay in *DeJesus*. Moreover, in this case, the delay cannot be attributed to Dr. Eisenberg. Although Carson stated that he believed his hand might be broken, the record does not support that Dr. Eisenberg knew of the fractures when he examined Carson on January 5 and 6, or that he became aware of the fractures prior to their diagnosis by Dr. Kostopoulos. While Carson may reasonably contend that Dr. Eisenberg *should* have promptly ordered an x-ray and discovered the extent of his injury earlier, such a claim sounds in negligence rather than deliberate indifference, as noted above. Further, the record shows that a mere six days passed between the hallway conversation and Carson's consultation with Dr. Kostopoulos, the orthopedic surgeon. Thus, only a *de minimis* delay occurred once Dr. Eisenberg was made aware of Carson's ongoing pain and need for additional treatment. On January 25, Dr. Kostopoulos recommended surgery, which Dr. Eisenberg ordered that same day.

In support of his position, Carson relies upon *Walker v. Brooks*, 2009 WL 3183051 (W.D. Pa. Sept. 30, 2009), where the court held that a jury could reasonably find deliberate indifference find based upon a year-long delay in providing the plaintiff with necessary hip surgery. 2009 WL 3183051, at *6. In that case, it was undisputed that the "primary reason" behind the one-year delay of the surgery was the plaintiff's status in the RHU, where proper post-operative care and physical therapy were not available. *Id.* at *4. But here, there is no record evidence to support a finding that non-medical reasons caused the delay. Finally, here, there was no delay from the date that Dr. Kostopoulos recommended surgery and the date that Dr. Eisenberg ordered surgery. Thus, the length and reasons for the delay in *Walker* are not analogous to those at issue in this case and do not support Carson's claim. Viewing the record evidence in the light most favorable to Carson, the Court finds that no reasonable jury could conclude that Dr. Eisenberg was deliberately indifferent to Carson's serious medical needs. Accordingly, Dr. Eisenberg's motion for summary judgment on Carson's Eighth Amendment claim will be granted.

D. Nurse Zupsic was not deliberately indifferent to Carson's serious medical need.

Nurse Zupsic also argues that the record cannot support a finding of deliberate indifference against her. The Court agrees. Nurse Zupsic's only involvement in Carson's care was her visit to his cell door on January 12 in response to his January 8 sick call request. ECF No. 113-1, ¶ 8, 12. Although the extent of her examination is in dispute, it is undisputed that she ordered an x-ray of Carson's right hand and provided him with ibuprofen following her examination. *Id.*; ECF No. 113-1, ¶ 13. Therefore, she cannot be found to have ignored Carson's condition or to have failed to provide him with treatment.

Further, where a prisoner is being treated by a physician, a nurse cannot be liable for denial or delay or medical care unless the nurse has reason to believe that the doctor is mistreating the prisoner. *Pearson v. Prison Health Service*, 850 F.3d 526, 540 n.4 (3d Cir. 2017). Here, there is no allegation that Nurse Zupsic knew or had reason to believe that Dr. Eisenberg was mistreating Carson; specifically, Carson has not alleged that he complained to her that Dr. Eisenberg failed to render adequate treatment. Even if he had made such a complaint, Nurse Zupsic ordered an x-ray the same day she examined Carson, which would belie any finding of indifference to the complaint. Based on these facts, the Court finds that no reasonable jury could find that Nurse Zupsic was deliberately indifferent to Carson's serious medical need and will enter summary judgment in her favor.

E. Defendants Smith, Overmeyer, and Wetzel were not deliberately indifferent to Carson's serious medical need.

Defendant Wetzel, Secretary of the Department of Corrections, (ECF No. 55 at ¶ 81), Defendant Overmyer, Superintendent at SCI-Forest (*Id.* at ¶ 77), and Defendant Smith, Corrections Health Care Administrator (CHCA) at SCI-Forest, move for summary judgment on the grounds that Carson has not shown that they were personally involved in the allegedly deficient treatment of Carson's serious medical need. The Court agrees.

In order to prevail on a claim pursuant to 42 U.S.C. § 1983, a plaintiff must prove that a defendant, acting under color of state law, deprived the plaintiff of a right secured by the Constitution or laws of the United States. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995); *Estate of Smith v. Marasco*, 430 F.3d 140, 151 (3d Cir. 2005); 42 U.S.C. § 1983. It is axiomatic that liability under § 1983 requires a defendant's "personal involvement" in the deprivation of a constitutional right. *See Gould v. Wetzel*, 2013 WL 5697866, at *2 (3d Cir. Oct. 21, 2013). This means that each defendant must have played an "affirmative part" in the

14

complained-of misconduct. *Iqbal*, 556 U.S. at 677 ("In a § 1983 suit ... [a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."); *Oliver v. Beard*, 358 Fed. App. 297, 300 (3d Cir. 2009). In the absence of specific allegations that a defendant played a role in depriving the plaintiff of a constitutional right, dismissal is appropriate. *See, e.g., Mearin v. Swartz*, 951 F.Supp.2d 776, 781-82 (W.D. Pa. 2013) (dismissing claims pursuant to Rule 12(b)(6) because the plaintiffs had failed to set forth sufficient facts to establish that certain defendants had played an affirmative part in the alleged Eighth Amendment violation).

Carson's allegations against Smith, Overmeyer, and Wetzel appear to be based entirely upon their participation in the grievance review process. It is "well established that the filing of a grievance is not sufficient to show the actual knowledge necessary for a defendant to be found personally involved in the alleged unlawful conduct." *Mearin v. Swartz*, 951 F.Supp.2d 776, 782 (W.D. Pa. 2013). *See also Mincy v. Chmielsewski*, 508 Fed. App. 99, 104 (3d Cir. 2013) ("[A]n officer's review of, or failure to investigate, an inmate's grievances generally does not satisfy the requisite personal involvement."). As such, courts have routinely dismissed civil rights allegations against prison officials whose only knowledge of the alleged violation stemmed from their participation in the grievance process. *See, e.g., Beale v. Wetzel*, 2015 WL 2449622, at *5 (W.D. Pa. May 21, 2015) (dismissing claims against senior prison officials because the only allegations against them arose in the context of their participation in an administrative appeal process); *Mearin*, 951 F.Supp. 2d at 782 (same); *Rogers v. United States*, 696 F.Supp.2d 472, 488 (W.D. Pa. 2010) ("If a grievance official's only involvement is investigating and/or ruling on an inmate's grievance after the incident giving rise to the grievance has already occurred, there is no personal involvement on the part of that official.").

In the present case, Smith, the CHCA, reviewed and denied Carson's grievance in August 2016, nearly eight months following Carson's surgery. ECF No. 113-1, ¶ 33, 34. There is no allegation that she had any contemporaneous knowledge of Dr. Eisenberg's allegedly dilatory treatment. Instead, her involvement in this case stems solely from her review and denial of Carson's grievance. This is insufficient to establish her personal involvement. *See Mincy*, 508 Fed. App. at 104 ("[A]n officer's review of, or failure to investigate, an inmate's grievances generally does not satisfy the requisite personal involvement.").

Overmeyer and Wetzel denied Carson's appeals of Smith's decision. ECF No. 113-1, ¶ 37. As with Smith, Carson does not allege that these Defendants had any contemporaneous knowledge of Carson's treatment or care when it was occurring eight months prior. *Id.* Thus, no record evidence suggests that they were personally involved. For these reasons, Defendants Smith, Wetzel, and Overmeyer are entitled to summary judgment on the claims against them.

VI.   Conclusion

For the forgoing reasons, Defendants' motions for summary judgment [ECF Nos. 88 & 98) are GRANTED.

_____
RICHARD A. LANZILLO
UNITED STATES MAGISTRATE JUDGE

Entered this 27th day of December, 2019.